13-491-cr
United States v. Whitman

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT.  CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1.  WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER").  A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 19th day of February, two thousand fourteen.

PRESENT:
> JON O. NEWMAN,
> PETER W. HALL,
> GERARD E. LYNCH,
>
> *Circuit Judges.*

---

UNITED STATES OF AMERICA,

> *Appellee*,

v.                                                                 No. 13-491-cr

DOUG WHITMAN,

> *Defendant - Appellant*,

---

FOR APPELLANT:        CARTER G. PHILLIPS (Quin M. Sorenson, Erika L. Myers, Nicholas W. Thompson, Washington, DC, David L. Anderson, San Francisco, CA, David M. Rody, Michael D. Mann, New York, NY, *on the brief*), Sidley Austin LLP, Washington, DC, *for* defendant-appellant Doug Whitman.

FOR APPELLEE:         JILLIAN B. BERMAN, Assistant United States Attorney (Micah W.J. Smith, Brent S. Wibble, Assistant United States Attorneys, *on the brief*), *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY.

Appeal from the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the district court is AFFIRMED.

Defendant-appellant Doug Whitman appeals from a January 29, 2013 judgment of the district court convicting him of two counts of conspiracy to commit securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff, and 17 C.F.R. § 240.10b-5, and two counts of securities fraud in violation of those same sections. The court sentenced Whitman to twenty-four months' imprisonment on each count (all to run concurrently), one year of supervised release, and a $250,000 fine. We assume the parties' familiarity with the facts and procedural history of this case, which we summarize only so far as is necessary to understand our rulings.

Whitman challenges his convictions by means of a series of objections to the district court's evidentiary rulings and jury instructions. Because all the challenged rulings were correct or did not prejudice the defendant, the judgment of the district court is affirmed.

I.      Evidentiary Rulings

Whitman challenges the district court's exclusion of three types of testimony: portions of experts' opinions, an unavailable witness's prior sworn testimony, and a corroborating witness's impression of Whitman's state of mind. "We review a district court's ruling to admit or exclude evidence under a deferential abuse of discretion standard." United States v. Bell, 584 F.3d 478, 486 (2d Cir. 2009) (internal quotation marks omitted). A district court's decision will stand unless "manifestly erroneous," Phoenix Assocs. III v. Stone, 60 F.3d 95, 100 (2d Cir. 1995), and any error is harmless unless the mistake prejudiced the outcome of the trial, see Phillips v. Bowen, 278 F.3d 103, 111 (2d Cir. 2002).

2

A. Expert Testimony

District courts may admit expert testimony where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). A district court acts as a "gatekeep[er]" to separate sound analysis from sophistry, "mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999). In assessing reliability, "the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (internal citation and quotation marks omitted).

Whitman proffered two experts in this case – George Kelly, a Wall Street analyst tasked with decoding industry jargon and describing investment analysts' research methods, and Michael Mayer, a financial consultant who had analyzed patterns in Whitman's past trades. After hearing extensive argument from the government and the defense, the district court narrowed the scope of both experts' testimony. Whitman challenges these restrictions as unreasonable. But the district court acted well within its discretion, making fair judgments about the quality of each expert's methods and the reliability of their analyses.

The district court allowed Kelly to give the jury a primer on how hedge funds gather information about investment targets, or, in the words of defense counsel, on the "relationship

3

between the analyst and the investment community." J. App'x at 609. The court reasonably declined to permit Kelly to extrapolate specific conclusions about Whitman's actions from this general knowledge about common strategies. The court also prevented Kelly from opining about Whitman's and his alleged co-conspirators' use of slang words like "mole" and colloquial phrases like "getting an edge." J. App'x at 745. The court reasoned that the jury could use common sense to unpack a double entendre, particularly where fact witnesses would testify about what they intended to convey, or their understanding of the meaning of messages they received. Both limits stemmed from the same reasonable conclusion – that despite his long experience on Wall Street, Kelly did not have "sufficient facts or data" to opine about the specific events in this case. Fed. R. Evid. 702(b).

The district court also prevented Mayer from making similar logical leaps. After analyzing "[s]even thousands lines of data," each entry capturing a trade Whitman made over the course of eleven years, Mayer purported to compare the trades challenged by the government – a sizable purchase of Polycom stocks just before a bullish earnings report, an aggressive short on Google shares days before a disappointing quarterly call, and sales of Marvell stock when the company appeared healthy to other observers – to Whitman's past investment choices. Mayer proffered his opinion that the challenged trades were similar to a handful of past trades that the government did not claim resulted from an inside tip.

The district court reasonably concluded that Mayer lacked a sufficient basis to jump from modest similarities between trades to a conclusion that the allegedly illegal trades resulted from sound research rather than inside information. Mayer himself admitted that "out of all those thousands of trades," he identified "ten or fewer that were comparable," and that he had not

4

"appl[ied] a statistical test" to determine whether the similarities were statistically significant. J. App'x at 1372. Nor had Mayer used any objective methods to chose parameters to identify comparable trades. Mayer acknowledged that he simply made a "judgment" that setting an outer time limit of 30 days before an earnings report would capture similar trades because that is when similar trades occur. J. App'x at 1376. We cannot fault the judge's reasonable conclusion that Mayer's logic was circular and "ad hoc." J. App'x at 1379.

The district court thus reasonably allowed Mayer to describe the Polycomm and Marvel trades as comparable to other trades, but did not allow him to opine that they were therefore not the result of inside information. In the case of the Google short, the district court prohibited Mayer from opining about the trade, concluding that the jury could make the relevant comparisons without expert aid. In proffered testimony that defense counsel acknowledged did not "involve expertise," J. App'x at 1367, Mayer proposed to repeat the simple fact, to which the court correctly predicted Whitman himself would testify, that Whitman had traded Google before. The jury was able to evaluate this fact against the equally unchallenged facts that Whitman had never held a long-term position in Google, and had not traded Google stock for over two years when he made the challenged trade. Absent any reason that such a comparison required expert skill, the court concluded that the jury would learn nothing new by having an expert review what would already be in the record.

In sum, the district court set reasonable limits on Kelly and Mayer's testimony: Kelly was allowed to explain the general workings of a technical world, but was not allowed to render specific opinions about companies and people he knew nothing about. Mayer was permitted to draw comparisons based on his review of a large number of trades, but was not permitted to turn

5

those comparisons into speculative conclusions about why Whitman made a specific trade. Under the circumstances, we cannot say that the district court's judgment about the proper scope of the experts' testimony was unreasonable.

B. Unavailable Witness

Rule 804(b)(1) of the Federal Rules of Evidence exempts prior testimony given by an unavailable witness from the hearsay rule if the party against whom the testimony is now offered had "an opportunity and similar motive to develop [the testimony] by direct, cross-, or redirect examination." Fed. R. Evid. 804(b)(1)(B). A party had a "similar motive" if it had a "substantially similar degree of interest in prevailing on that issue" at the two proceedings. United States v. DiNapoli, 8 F.3d 909, 912 (2d Cir. 1993). In DiNapoli, we held that a prosecutor does not have the same motive when questioning a witness before a grand jury as when cross-examining a witness at a later trial, because a prosecutor "us[es] the grand jury to investigate possible crimes and identify possible criminals," and thus, unlike at trial, has little incentive to undermine an unhelpful witness's credibility. Id. at 913.

Whitman sought to read into the record the prior deposition of alleged tipper Sunil Bhalla, taken during an SEC civil investigation, in which Bhalla denied passing inside information to Whitman. Bhalla was unavailable to testify at trial, having asserted his Fifth Amendment right against self-incrimination. After reviewing the deposition transcript, the district court concluded that the SEC's motive was investigatory, thus mirroring the DiNapoli prosecutor's aim before the grand jury rather than that of a prosecutor cross-examining a defense witness at a criminal trial.

We cannot disagree.  Assuming arguendo that the SEC lawyers and the trial prosecutors can be treated as the same party, the district court reasonably concluded that they had differing motivations to develop testimony by cross-examination.  As we noted in DiNapoli, in assessing the party's motive, whether or not the party actually engaged in cross-examination is "relevant[,] though not conclusive."  8 F.3d at 915.  In the excerpt of Bhalla's deposition proffered by Whitman, the SEC attorney asked Bhalla only two leading questions.  The rest of the examination consisted of general inquiries about his relationship to Roomy Khan and his work at Polycom, many of which elicited long, descriptive answers from Bhalla that, unsurprisingly, asserted innocence.  A prosecutor seeking to rebut a trial defense would have pressed the witness, but the SEC examiner rarely did, for the most part allowing Bhalla's testimony to stand unquestioned.  Whitman points to no other evidence that persuasively contradicts the district court's inference that the SEC deposition was taken with an investigatory motive that differed from the adversarial motive that would be present at trial.

While DiNapoli suggests that certain categories of proceedings will always be inadmissible as prior testimony, we need not reach the question of whether, as a general matter, civil depositions can ever meet the criteria enunciated Rule 804(b)(1).  In some situations, a civil deposition may well mirror the testimony that would be elicited at trial, or other evidence may suggest that the lawyer taking the deposition had a "similar motive" to develop the testimony as the same party would later have at trial.  But on the facts of this case, we cannot fault the district court's careful review of the circumstances, or find that it abused its discretion in excluding Bhalla's deposition.

7

C.  Excluded Corroborating Testimony

Whitman challenges the district court's refusal to allow Whitman's associate, Jason Ader, to describe Whitman's reaction to Roomy Khan's arrest.  Defense counsel proffered that Ader would have testified that Whitman "evinced no anxiety or concern whatsoever upon learning that Khan was an FBI informant." J. App'x at 1850.  The district court denied the request, either because the court thought the statement was hearsay, or because the court found the testimony more prejudicial than probative.

Assuming *arguendo* that the testimony should have been admitted, any error was harmless.  During Whitman's direct examination, the defense played tapes of conversation in which Whitman joked about Khan's arrest, audibly laughing about Khan's audacious tactics.  Asked by his counsel about his light attitude towards Khan's crimes, Whitman insisted that he had always stayed on the right side of the law, that he had "made a lot of fun of Roomy" and warned her that she be more careful or she could go "to jail for that." J. App'x at 1506, 1509.  Thus, Whitman provided a first-person account of Ader's excluded, second-hand testimony:  Whitman told the jury that he maintained a "jocular" attitude toward Khan because he had no reason to worry that he had benefitted from her suspect tactics, corroborated by recordings in which he displayed such an attitude. J. App'x at 1507.  Ader's testimony, which as proffered would have primarily consisted of his evaluation of Whitman's tone and demeanor, would have at best provided limited corroboration of Whitman's testimony.  On the whole record before us, we cannot conclude that the exclusion of this small piece of testimony was material to the outcome of the case.  Assuming, without deciding, that the district court erred, we see no prejudice.

8

II.     Jury Instructions

"We review jury instructions *de novo* with regard to whether the jury was misled or inadequately informed about the applicable law."  Terranova v. New York, 676 F.3d 305, 308 (2d Cir. 2012).  "As a general proposition, harmless-error analysis applies to instructional errors so long as the error at issue does not categorically vitiate all the jury's findings."  United States v. Moran-Toala, 726 F.3d 334, 244 (2d Cir. 2013) (internal citations and quotation marks omitted).  Only "structural errors," mistakes that "so fundamentally undermine the fairness or the validity of the trial," create reversible error regardless of prejudice.  Id. at 343.

A.  Conscious Avoidance Instruction

"A conscious avoidance instruction permits a jury to find that a defendant had culpable knowledge of a fact when the evidence shows that the defendant intentionally avoided confirming the fact."  United States v. Ferrarini, 219 F.3d 145, 154 (2d Cir. 2000).  A court may only give a conscious avoidance instruction where "(1) the defendant asserts the lack of some specific aspect of knowledge required for conviction, . . . and (2) the appropriate factual predicate for the charge exists, i.e., the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt . . . . that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact."  Id. (internal citations and quotation marks omitted).

Whitman concedes that the first condition was met: he denied knowledge of Khan and Motey's illegal tactics.  He argues only that the factual predicate for a conscious avoidance instruction was lacking.  Whitman relies on the Supreme Court's decision in Global-Tech Appliances, Inc. v. SEV S.A., which explained that "a willfully blind defendant is one who takes

9

deliberate actions to avoid confirming a high probability of wrongdoing." 131 S.Ct. 2060, 2070-71 (2011). Whitman draws on the words "deliberate actions" to argue that "there was absolutely no evidence" that Whitman made "active efforts . . . to avoid learning that the information he allegedly received from Motey or Khan was improperly obtained." Appellant's Brief at 45 (internal quotation marks omitted).

But as we have recently noted, Global-Tech is fully consistent with prior circuit law as applied by the district court. United States v. Goffer, 721 F.3d 113, 128 (2d Cir. 2013). The opinion "synthesized conscious avoidance instructions from eleven circuit courts . . . [and] did not alter or clarify the doctrine." Id. And as this Court has held, a factual predicate "may be established where a defendant's involvement in the criminal offense may have been so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge." United States v. Svoboda, 347 F.3d 471, 480 (2d Cir. 2003) (internal citations and quotation marks omitted).

In Svoboda, the source and timing of a tip were enough to trigger a conscious avoidance instruction. Id. at 480-81 (reasoning that a tip from a bank's credit officer days before tender offer raised a red flag). Here, Whitman's own words were far more damning, and provided ample factual basis for the conclusion that he could avoid positive knowledge that Khan and Motey used illegal channels to get confidential information only by deliberately closing his eyes to facts well known to him. Whitman called Khan "Ms. Google." J. App'x at 2077. He told Wes Wang that Khan "had a mole there[, at Google,] for a while," whom she lost because "the [contact] wanted [Khan] to take care of her for . . . giving her the information" and that Khan "didn't have enough sense to go out and buy [the contact] some really nice present." J. App'x at

10

2084. The jury could easily conclude that Whitman knew that Khan courted trouble, and yet rather than question Khan about whether she had crossed a line, he encouraged Khan to "buy this woman a beautiful purse or something." J. App'x at 2085. He was equally cavalier about Khan's connection to Bhalla, teasing Khan that she should "[u]se a[n untraceable] skype phone number" to "call[] Sunil and get[] a good call on Polycom.." J. App'x at 2077. In the face of substantial evidence that Khan had considered paying for information from an inside source, Whitman did not question Khan about whether she had done something illegal. Instead, the jury could reasonably have found, he advised her on how to continue pumping her sources.

Whitman's insistence that Motey revive his compromised contacts at Marvell similarly provided a predicate for a conscious avoidance instruction as to Whitman's knowledge of Motey's research strategies. Whitman told Motey that Marvell's management had "caught you, dude," J. App'x at 2059, and that he failed to "protect" his Marvell sources, who then "g[o]t in trouble." J. App'x at 2060. He entreated Motey to call those sources back, using an internet phone number to mask his identity or to "hit star 67, [so] [y]our number won't show up." J. App'x at 2061. The jury could have reasonably found that Whitman knew that Motey's sources had violated a corporate policy, but avoided learning exactly what those sources had done wrong.

Whitman never expressly told Khan or Motey that he would rather not know the story behind a suspicious tip. But a defendant's "purposeful contrivance" to avoid knowledge, Svoboda, 347 F.3d at 480, may not manifest in an affirmative act because "the very nature of conscious avoidance makes it unlikely that the record will contain directly incriminating statements." United States v. Kozeny, 667 F.3d 122, 134 (2d Cir. 2011). For that reason, "[i]t is

11

not uncommon for a finding of conscious avoidance to be supported primarily by circumstantial evidence." Id. Whitman responded to warning signs about the nature of Khan and Motey's tips not with skepticism but with advice on how better to play fast and loose. A reasonable jury could thus infer that Whitman either knew that Khan and Motey had inside information, or that he deliberately determined not to draw the obvious conclusion. See Svoboda, 347 F.3d at 480 (noting that the "same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct"). Accordingly, the district court did not err in instructing the jury on conscious avoidance.

B. Knowledge of a Personal Benefit to a Tipper

We have yet to decide whether a remote tippee must know that the original tipper received a personal benefit in return for revealing inside information. Compare United States v. Rajaratnam, 802 F. Supp. 2d 491, 499 (S.D.N.Y. 2011) (holding that a remote tippee must know that original exchange was given in exchange for benefit), with United States v. Newman, No. 12cr121, 2013 WL 1943342 at * 2 (S.D.N.Y. May 7, 2013) (holding that remote tippee need only know that tipper breached a fiduciary duty and not have specific knowledge that tipper received a personal benefit). But that question is not at issue in this case because the district court's instruction favored the defendant.

The district court told the jury – not once but four times – that Whitman could only be found guilty if he knew that a tippee received a personal benefit. In its opening lines outlining the elements of securities fraud, the court advised the jury that:

> [T]he government . . . must prove . . . that [Whitman] traded . . . on
> the basis of material nonpublic information about the company,

12

> knowing that the information had been obtained from an insider of the company who had provided the information in violation of that insider's duty of trust and confidence, in exchange for or in anticipation of a personal benefit.

J. App'x at 2030. The court twice repeated the instruction when describing particular counts. Finally, towards the end of the charge, the judge noted that although the government need not prove that Whitman knew "the specific benefit given or anticipated," it had to prove that Whitman had "a general understanding that the insider was improperly disclosing inside information for personal benefit." J. App'x at 2032.

Whitman argues that these instructions were ambiguous. According to Whitman, the word "knowing" in the court's initial instruction was so far removed from the clause "in exchange for or in anticipation of personal benefit," that the sentence's structure could be read to create two separate elements: knowledge of a breach of fiduciary duty, and simple existence of a self-serving motive. Appellant's Brief at 48.

Whitman's argument is simply wrong. As a grammatical matter, the "personal benefit" language can only be read as part of the clause introduced by "knowing." We see no ambiguity whatsoever in the court's formulation. In any event, as the Supreme Court long ago held, a specific jury instruction "must be viewed in the context of the overall charge." Cupp v. Naughten, 414 U.S. 141, 146-47 (1973). Any ambiguity in the court's initial phrasing – and we see none – was resolved by the court's closing clarification. The judge specifically instructed that in order to convict, the jury must find that Whitman had a "general understanding" that an insider breached a duty in exchange for a personal benefit. Whitman argues that this wording is opaque, but the phrase communicates a clear message: the defendant had to "understand[]," that is, know, that the tipper had broken rules in return for consideration, even if the tippee never

13

learned the nature of a particular bribe.  Thus, because the district court adopted the defense's view of the law, and went out of its way to detail the standard required, we cannot find any error or prejudice to the defendant.

C.      Duty Not to Disclose

Insider trading depends upon insiders – people with access to information that the public does not have, and an obligation to keep that information secret.  In United States v. Chestman, we explained that such an obligation arises when a tipper is in a "relationship of trust and confidence" with a company's shareholders or stewards, a bond that must either be that of a fiduciary or "the functional equivalent of a fiduciary relationship." 947 F.2d 551, 568 (2d Cir. 1991). At trial and on appeal, Whitman argued that any such duty must arise from state law, and faulted the district court for rejecting his proposal that the jury be instructed based on California law.  See United States v. Whitman, 904 F. Supp. 2d 363, 368-70 (S.D.N.Y. 2012).  We have recently settled any uncertainty about this issue, holding that "the fiduciary-like duty against insider trading under section 10(b) is imposed and defined by federal common law," and specifically citing the opinion below with approval.  Steginsky v. Xcelera, Inc., ___ F.3d ___, 2014 WL 274419 at *5 (2d Cir. Jan. 27, 2014).  Since Whitman does not argue that the district court misstated the relevant federal law, and challenges the instruction on duty only insofar as it failed to instruct on state law, we reject his claim of error in the district court's instruction.

D.  Significant Factor

Defendants violate the law when they trade "while in knowing possession of nonpublic information material to those trades." United States v. Royer, 549 F.3d 886, 899 (2d Cir. 2008) (internal quotation marks omitted).  Relying on this rule, the district court instructed the jury that

14

inside information must be "at least a factor" in Whitman's trading decision.  Whitman does not

dispute that under the law of this Circuit, he was entitled to no more favorable instruction, but

argues that we should adopt the law of the Ninth Circuit, which dictates that a defendant is only

liable if inside information was a "significant factor" in an investment choice.  United States v.

Smith, 155 F.3d 1051, 1066 (9th Cir. 1998).  As Whitman acknowledges, his proposed change in

circuit law could be adopted only by the Court sitting en banc.  Absent such review, we are

bound by controlling circuit precedent just as the district court was.  We therefore find no error

in the instruction.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.


FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

15